not be a federal offense under the substantive provision of the replacement statute, no exception to th[e] continuing liability under § 109 can be found. . . .).

The district court thought the rule established by these cases to be inapplicable and instead relied on the rule that "the general savings clause does not ordinarily preserve discarded remedies or procedures." *Marrero*, 417 U.S. at 661. By interpreting the Savings Statute as not applying to ordinary procedural amendments and revisions, courts avoid having every last bit of old procedure carried forward whenever liability predates an amendment to a procedural rule. But this limited exception for procedural rules does not swallow the plain language of the Savings Statute. Courts are not authorized to eliminate the entire statutory scheme for obtaining a penalty, leaving the penalty with no mechanism to enforce it. Repeals "shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute." 1 U.S.C. § 109. The district court's theory, however, would have the effect of releasing or extinguishing the death sentence whenever a defendant who was sentenced to death under § 848 became entitled to a resentencing and whenever a defendant's death-eligible § 848 murder predated the FDPA.

Both the Supreme Court's and this Court's cases confirm what the plain language of the Savings Statute makes clear. The Savings Statute does preserve the enforcement scheme needed for a penalty. Justice Frankfurter made this point

31

in *De La Rama S.S. Co. v. United States*, 344 U.S. 386 (1953): "[W]here the object of Congress was to destroy rights in the future while saving those which have accrued, to strike down enforcing provisions that have special relation to the accrued right and as such are part and parcel of it, is to mutilate that right and hence to defeat rather than further the legislative purpose." *Id.* at 384. Any other result would have the inexplicable consequence of reading the Savings Statute as necessarily preserving the death sentence (even if Congress had repealed death eligibility in the future) while simultaneously reading the Savings Statute as eliminating the only mechanism for obtaining that death sentence.

Where Congress has expressly retained death eligibility in § 848(e), it would be especially improper to allow courts' reading of a procedural exception to "have the effect to release or extinguish [the] penalty" of the continuously maintained death eligibility. Congress plainly did not mean to eliminate death eligibility given that Congress has passed a savings clause designed to prevent inadvertent repeals and given that Congress expressly retained death eligibility in § 848(e). The interpretation of the repeal and the Savings Statute are both questions of statutory interpretation, and under settled canons of statutory interpretation, repeals by implication are disfavored and will not be found unless "clear and manifest." *Rodriguez v. United States*, 480 U.S. 522, 524 (1987)

32

(quoting *United States v. Borden Co.*, 308 U.S. 188, 198 (1939); *Red Rock v. Henry*, 106 U.S. 596, 602 (1883)).

In the years since *De La Rama* was decided, this Court has applied its reasoning. In *Korshin*, this Court rejected a taxpayer's argument that subsequent revisions to the tax code lowered his tax responsibilities and found that the IRS retained the power to collect the money owed. This Court explained that the Savings Statute, "by its terms, preserves the IRS's power to collect those liabilities. . . ." *Korshin*, 91 F.3d at 674. More generally, this Court noted, "By the General Savings Statute Congress did not merely save from extinction a liability incurred under the repealed statute; it saved the statute itself." *Id.* (quoting *De La Rama S.S. Co.*, 344 U.S. at 389).

Because the death-sentencing procedures in § 848 provide the statute's sole enforcement mechanism, the Savings Statute preserves them. At the time that the defendant committed his offense, it was clear under § 848(g) that § 848's sentencing procedures were the only mechanism for imposing the death sentence authorized by § 848(e). The district court's additional argument that, even after the repeal of the § 848 procedures, the FDPA cannot be applied to Stitt's resentencing reinforces that the § 848 procedures must be preserved. No other mechanism but the § 848 procedures are available. As discussed below, if this Court were to conclude that the Savings Statute does not save the § 848

procedures, then canons of statutory construction would justify applying the FDPA procedures. But if the § 848 procedures are saved, there is no reason to reach the applicability of the FDPA because § 848(g) would be saved, precluding the use of the FPDA.

One final point deserves mention. Under now-firmly-established law, the aggravating factors in § 848(n) serve as "the functional equivalent of an element of a greater offense." *Ring v. Arizona*, 536 U.S. 584, 609 (2002). *See also United States v. Barnette*, 390 F.3d 775, 784 (4th Cir. 2004), *vacated and remanded on other grounds*, 126 S. Ct. 92 (2005); *United States v. Higgs*, 353 F.3d 281, 298-99 (4th Cir. 2003); *United States v. Jackson*, 327 F.3d 273, 303-305 (4th Cir. 2003). Repeal of the aggravating factors therefore is not merely procedural but is instead substantive, another factor undercutting the district court's ruling.

> **2.    If the Savings Statute does not preserve the death-sentencing procedures in § 848, then the Federal Death Penalty Act applies. Statutes must be read together, and repeals by implication must be clear and manifest.**

If this Court accepts the government's argument that the Savings Statute preserves the procedures under § 848, then the following arguments need not be addressed. But if this Court were to conclude that the repealed sentencing provisions in § 848 fall outside the scope of the Savings Statute, then this Court would be faced with the task of reconciling the provisions in the FDPA with

Congress's express command to make (and continue to make) violations listed in § 848(e) death eligible.

The district court noted that 18 U.S.C. § 3593(b)(2)(D) permits a sentencing jury to be empaneled "after initial imposition of a sentence under this section, reconsideration of the sentence under this section is necessary." The district court reasoned that, since Stitt's original death sentence was not imposed under the FDPA, the resentencing provision in § 3593(b)(2)(D) do not apply. But the district court ignored that Congress has made and continues to make Stitt's offense death eligible in 21 U.S.C. § 848(e), and by hypothesis, the FDPA is now the only statutory mechanism available for imposing a death sentence.

As explained above, the Savings Statute provides what the government believes is Congress's preferred solution—the § 848 procedures apply for offenses committed before those procedures were repealed. But if those procedures are not saved, then courts are not free to ignore—as the district court did—Congress's command that Stitt's offense is death eligible. Courts must read together the congressional command in § 848(e) as well as the provisions in the FDPA, and *both* provisions must be given effect. As the Supreme Court has often said, "[C]ourts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part, including later-enacted statutes." *Branch v. Smith*, 538 U.S. 254, 281 (2003). Although in this case, the task of reconciling statutes

35

stems from the later repeal of certain provisions, while retaining others, the underlying principle remains the same. *Cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) ("The 'classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute.") (quoting *United States v. Fausto*, 484 U.S. 439, 453 (1988)). As the Supreme Court has long said, "The correct rule of interpretation is, that if divers statutes relate to the same thing, they ought to be taken into consideration in construing any one of them. . . . If a thing contained in a subsequent statute, be within the reason of a former statute, it shall be taken to be within the meaning of that statute." *Branch*, 538 U.S. at 281 (quoting *United States v. Freeman*, 44 U.S. 556, 564-65 (1845)).

Under the circumstances, it creates no great distortion of congressional intent and statutory language to read the phrase "after initial imposition of a sentence under this section" as encompassing a death sentence for an offense that Congress has now said is covered by the FDPA. In contrast, it greatly distorts congressional intent and statutory language to read out of existence Congress's express provision in § 848(e) making Stitt's offense death eligible. As noted above, "repeals by implication are not favored." *Watt v. Alaska*, 451 U.S. 259,

36

267 (1981) (quoting *Morton v. Mancari*, 417 U.S. 535, 549 (1974)). And thus, "[t]he intention of the legislature to repeal must be 'clear and manifest.'" *Id.*

To repeal § 848(e) in all resentencings like Stitt's and all pre-1994 offenses is unjustified when Congress has maintained death eligibility all along for those offenses and merely switched procedures from those in § 848 to the FDPA. Nothing in the repeal or the language in the FDPA comes close to a "clear and manifest" intent to grant amnesty to entire categories of defendants.

The district court's interpretation would also violate other, similar statutory canons. By ignoring § 848(e), the district court also violated the "well-recognized canon of construction [that] requires courts to read statutory provisions so that, when possible, no part of the statute is superfluous." *United States v. Talebnejad*, 460 F.3d 563, 568 (4th Cir. 2006); *see also Clark v. Arizona*, 126 S. Ct. 2709, 2723 n. 24 (2006) (under the rules of statutory construction, statutes are to be read "giv[ing] effect, if possible, to every clause and word of a statute") (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)); *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (quotation marks and citations omitted).

37

Much as § 3593(b)(2)(D) can be read as applying, to avoid repealing § 848(e) for entire categories of defendants, so too § 3593(b)(2)(C) can be read to apply. Under § 3593(b)(2)(C), a new sentencing jury is authorized where "the jury that determined the defendant's guilt was discharged for good cause," and nothing in the concept of "good cause" prohibited its application here. Indeed, the jury was properly discharged after it reached a verdict. The only change that has occurred is that the district court granted the defendant's § 2255 petition. Consequently, § 3593(b)(2)(C) can be read to apply in this case.

Parenthetically, the district court was mistaken when it argued that a single jury must decide the guilt phase and penalty phase, and invoked *United States v. Brown*, 441 F.3d 1330, 1353-54 (11th Cir. 2006), *cert. denied*, 127 S. Ct. 1149 (2007), *United States v. Young*, 424 F.3d 499, 505 (6th Cir. 2005), and *United States v. Green*, 407 F.3d 434, 441-42 (1st Cir. 2005). Those cases all deal with pretrial efforts by defendants to have separate juries decide guilt and punishment, a situation not contemplated by either § 848 or the FDPA. In contrast, both statutes expressly provide for a new jury after a death sentence has been vacated post-trial, so there is no obstacle under *Brown*, *Young*, and *Green* to empaneling a new sentencing jury.

Moreover, if the repeal of the § 848 provisions was purely procedural in nature, use of the FDPA would not violate the *Ex Post Facto* Clause. The

38

Supreme Court has repeatedly held that no violation of the *Ex Post Facto* Clause occurs where a change to a statute merely affects procedural instead of substantive rights:

> Several of our cases have described as "procedural" those changes which, even though they work to the disadvantage of the accused, do not violate the *Ex Post Facto* Clause. While these cases do not explicitly define what they mean by the word "procedural," it is logical to think that the term refers to changes in the procedures by which a criminal case is adjudicated, as opposed to changes in the substantive law of crimes.

*Collins v. Youngblood*, 497 U.S. 37, 45 (1990) (internal citations and quotation marks omitted). In *Collins*, the Court ultimately concluded that a modification of a criminal statute after a defendant commits an offense that "does not punish as a crime an act previously committed, which was innocent when done; nor make more burdensome the punishment for a crime, after its commission; nor deprive one charged with crime of any defense available according to law at the time when the act was committed . . . is not prohibited by the *Ex Post Facto* Clause of Art. I, § 10." *Id.* at 52.

Similarly, in *Dobbert v. Florida*, 432 U.S. 282 (1977), the Court rejected a challenge grounded in the *Ex Post Facto* Clause to a death sentence, finding that changes to the Florida capital sentencing scheme were "clearly procedural" because "[t]he new statute simply altered the methods employed in determining

39

whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime." *Id.* 293-94.

The Fourth Circuit has likewise rejected *Ex Post Facto* challenges to death sentences where the state significantly modified the capital sentencing scheme. *See Booth-El v. Nuth*, 288 F.3d 571, 576-80 (4th Cir. 2002) (finding changes to Maryland's capital sentencing statute pertaining to burden of proof for the mitigating factor of intoxication to be procedural and not to the disadvantage of defendant); *Rose v. Lee*, 252 F.3d 676, 683-84 (4th Cir. 2001) (rejecting *Ex Post Facto* challenge to death sentence based upon amendments to North Carolina's capital sentencing statute that procedurally barred defendant's claims in his habeas corpus petition); *Evans v. Thompson*, 881 F.2d 117, 120-21 (4th Cir. 1989) (rejecting *Ex Post Facto* challenge to death sentence based upon modification of Virginia's capital sentencing scheme).

As noted above, the *Ex Post Facto* Clause does preclude the Government from relying on any new aggravating factors in the FDPA that were not present in § 848 when the defendant murdered the victim. *See Higgs*, 353 F.3d at 301. But if the Government relies on those statutory aggravating factors set forth in 21 U.S.C. § 848(n) that existed at the time that the defendant committed the capital offenses, there is no *Ex Post Facto* violation, and as *Dobbert, Booth-El, Rose,* and *Evans* establish, all other changes from the § 848 procedures to the FDPA

40

procedures are not barred by the *Ex Post Facto* Clause. In this case, the Government would not rely on any additional aggravating factors that were not in § 848(n) at the time of the murders and that were not alleged in the death notice. Consequently, there is no constitutional prohibition against using the procedures in the FDPA in this case.

Finally, the government would have no objection to allowing Stitt to choose whichever set of procedures he prefers—the ones in § 848 or the FDPA. What Stitt is not entitled to receive, however, is a complete abolishment of death eligibility. It defies logic that he could now escape the full consequences of his actions simply because Congress switched from one set of procedures to another to ensure uniformity in the capital sentencing. Congress manifestly did not seek to eliminate the death sentence for defendants like Stitt.

**II.    The district court's equitable powers in granting relief under § 2255 neither permitted the court to ignore binding statutes nor authorized the court to place the defendant in a better position than he would have been absent his defense counsel's error.**

**A.    Standard of Review**

In reviewing the remedy granted by a district court under 28 U.S.C. § 2255, this Court has applied an abuse-of-discretion standard. *United States v. Hillary*, 106 F.3d 1170, 1173 (4th Cir. 1997). But it is also a general principle of law that

41

a district court "by definition abuses its discretion when it makes an error of law." *United States v. Koon*, 518 U.S. 81, 100 (1996).

## B.    Analysis

As the government argued above, the Savings Statute preserves the procedures in § 848. Among those procedures is the requirement that a jury must decide whether a defendant receives life imprisonment or death. *See* 21 U.S.C. § 848(i)(1). The only circumstance where a judge is authorized to decide alone whether a death sentence will be imposed is "upon the motion of the defendant and with the approval of the Government." 21 U.S.C. § 848(i)(1)(C). In this case, Stitt never moved for sentencing by the court, and the government certainly never agreed to such a course. The Federal Death Penalty Act similarly requires jury sentencing. Under 18 U.S.C. § 3593(b), a jury must decide whether to impose the death sentence, and again, a judge is permitted to decide alone whether to impose the death sentence only "upon the motion of the defendant and with the approval of the attorney for the government." 18 U.S.C. § 3593(b)(3).

The district court cited no authority that permits a federal court to violate binding statutes when the court grants relief under § 2255, and the government is aware of no authority that confers such discretion on a district judge. The scope of relief under § 2255 is defined by the statute. Once a court finds that a movant is entitled to relief, the district court "shall discharge the prisoner or resentence him

42

or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255. This statutory authority to grant "appropriate" relief, however, obviously does not authorize a district court to violate other federal statutes. Relief that violates federal law is not "appropriate" relief. To read the term "appropriate" as overriding other statutory commands would ignore the canon that statutes must be read together. *Branch*, 538 U.S. at 281.

The district court offered no argument that statutory limits on its power to grant relief are impermissible, and thus, this Court need go no further than the question of statutory interpretation. But the government notes that there is no reason for thinking that a district court must have the power, in granting habeas relief, to violate otherwise binding statutes. This Court has upheld congressional limits on when a federal court may grant relief for what is an otherwise valid claim of error in a defendant's conviction or sentence. *See, e.g., United States v. Pregent*, 190 F.3d 279, 283-84 (4th Cir. 1999) (noting that a § 2255 motion generally does not authorize relief for alleged non-constitutional error in applying the sentencing guidelines). Courts have likewise held that Congress may impose procedural bars on habeas relief. *See, e.g., Felker v. Turpin*, 518 U.S. 651 (1996) (upholding limit on successive habeas petitions). Given that Congress may circumscribe habeas relief, district courts do not possess inherent, unchanneled authority to violate binding federal statutes.

43

Moreover, quite apart from whether a district court may ignore binding statutes, the district court's grant of relief was too broad in another respect. This Court has explained that, when a defendant is entitled to habeas relief, the relief ordered by the district court should place the defendant in the *same* position that he would have been absent the error. "[T]he goal of § 2255 review is to place the defendant 'in exactly the *same* position he would have been' had there been no error in the first instance." *Hadden*, 475 F.3d at 665 (emphasis in original) (quoting *United States v. Silvers*, 90 F.3d 95, 99 (4th Cir. 1996) and citing *Hillary*, 106 F.3d at 1172). By refusing to impanel a new death-sentencing jury, the district court placed Stitt in a far better position than he would have been absent his attorney's private financial conflict at the sentencing phase. *Cf. Silvers*, 90 F.3d at 99 ("By reinstating the conspiracy conviction, the district court avoided giving Silvers a windfall and placed him in exactly the same position he would have been in had he not been erroneously convicted of the CCE count in the first instance.").

If district courts possessed the power to grant the relief ordered by the district court in this case, federal courts would have discretion to block state death-penalty laws (and presumably many other sentencing laws) whenever the federal district court found a basis for granting habeas relief. A court's equitable powers

44

in granting a remedy do not sweep so broadly as to provide a veto over any sentencing policy with which a district court disagrees.

Even where there has been prosecutorial or government misconduct (as opposed to ineffective assistance of counsel), courts apply stringent standards before an indictment may be dismissed with prejudice. *See, e.g., United States v. Dyess*, 478 F.3d 224, 234-35 (4th Cir. 2007). The Supreme Court has applied this logic more specifically to Sixth Amendment violations, even when those violations were committed by the government, such as by interrogating a represented defendant. "Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 365 (1981). By the same reasoning, a district court should not be permitted effectively to dismiss with prejudice a death notice because of ineffectiveness by a defendant's own lawyer at a sentencing phase. *Cf. Rompilla v. Beard*, 545 U.S. 374, 392 (2005) (finding ineffective assistance of counsel at capital-sentencing hearing, but granting state choice of conducting new capital sentencing or stipulating to life imprisonment). The more limited relief available in habeas, moreover, should not confer on a district court greater power than is available on direct appeal. A district court may not ignore Congress's will.

45

While invoking its equitable powers, the district court noted two additional reasons for refusing to empanel a new sentencing jury. First, the district court observed that a long time has elapsed since Stitt's original death sentence was imposed. But the relevant statutes expressly authorize a resentencing if a defendant's sentence is overturned. The passage of time also has done nothing to undercut Stitt's ability to defend against the aggravating factors upon which the government has relied (and will continue to use in a resentencing) as a basis for the death sentence. Indeed, if the passage of time helps either side, it is the defendant who benefits because he will now be able to introduce evidence of his good behavior while incarcerated since his trial, thereby countering the government's future dangerousness argument. And again, the government did not cause the error here, so this is not a case where the government acted improperly and then sought advantage from that misconduct. *Cf. United States v. Lovasco*, 431 U.S. 783, 795-96 (1977) (no due process violation for investigative delay in charging defendant); *United States v. Burns*, 990 F.2d 1426, 1435 (4th Cir. 1993) (same).

The district court's second argument was its claim that cases like *Brown*, 441 F.3d at 1353-54, *Young*, 424 F.3d at 505, and *Green*, 407 F.3d at 441-42 hold that a single jury should decide guilt and the death sentence. But as noted above, those cases all dealt with pretrial efforts by defendants to have separate juries

decide guilt and punishment. The cases provide no authority for invalidating the statutory provisions permitting a new sentencing jury when a defendant's original death sentence is overturned on appeal.

**III.    Given that Stitt never sought appointment of learned counsel under 18 U.S.C. § 3005,  that the learned-counsel provision does not even apply to defendants like Stitt who retain their own counsel, and that defense counsel did not lie about his capital experience, defense counsel's statements about his capital experience were irrelevant to his keeping his fee and never triggered a conflict of interest that violates the Sixth Amendment.**

### A.    Standard of Review

In an order filed on September 7, 2005, this Court previously denied a certificate of appealability (COA) on this issue in the appeal that this Court ultimately dismissed on August 16, 2006. Because this Court's denial of a COA was a determination that this Court lacks jurisdiction to entertain an appeal on the issue and did not hinge on whether this Court entertained an appeal on other issues, this Court's ruling denying a COA should remain binding. *Cf. United States v. Nicholson*, 475 F.3d 241, 244 (4th Cir. 2007) (limiting issues in second appeal when court denied COA in first appeal). *See also Rowe v. Director, Dept. of Corrections*, 111 Fed. Appx. 150, 151 (4th Cir. 2004) (unpublished) ("We previously denied a certificate of appealability and dismissed Rowe's appeal of the denial of his habeas petition in 2001, in which Rowe suggested his case should be

47

remanded for an evidentiary hearing. Principles of res judicata and law of the case therefore bar this appeal.") (citations omitted); *Harvin v. Rushton*, 104 Fed. Appx. 315 (4th Cir. 2004) (unpublished) (same); *Banks v. Dretke*, 383 F.3d 272, 279 (5th Cir. 2004) (circuit's earlier denial of COA remained binding after remand from Supreme Court on different issue).

Of course, this Court has observed that the law-of-the-case doctrine is "not a matter of rigid legal rule, but more a matter of proper judicial administration." *Lettieri v. Equant Inc.*, 478 F.3d 640, 652 (4th Cir. 2007) (quoting *Hill v. BASF Wyandotte Corp.*, 696 F.2d 287, 290 n.3 (4th Cir. 1982)). *See also Phelps v. Alameda*, 366 F.3d 722, 727-28 (9th Cir. 2004) (merits panel had power to vacate COA granted by motions panel). But given that Stitt's challenges to the penalty phase are now moot, *Hyman*, 824 F.2d at 1412, his arguments about the death-penalty experience of his lawyers are even weaker now, and he cannot satisfy the standards for a certificate of appealability in this new appeal. He fails to show that reasonable jurists would find the district court's rejection of his constitutional claim debatable or wrong. *Miller-El*, 537 U.S. at 336-38.

## B.    Analysis

Stitt argues that Malinski lied about his experience in capital cases to remain qualified as learned counsel under 18 U.S.C. § 3005, that Malinski committed the lie to ensure that he continued to receive his fee, that Malinski

48

therefore labored under a financial conflict, and that Stitt was prejudiced because Malinski did not step aside from the representation. The district court correctly rejected this argument.

Stitt's claim is premised on 18 U.S.C. § 3005, which provides that defendants who are charged with capital crimes have a right to receive two appointed counsel, one of whom must learned in the law applicable to capital cases. *See* 18 U.S.C. § 3005 ("the court before which the defendant is tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases.").

Because Stitt himself hired two lawyers, he focuses his challenge on the provision in § 3005 that at least one appointed lawyer be "learned in the law applicable to capital cases." As this Court has observed, Congress amended § 3005 in 1994 at the time that the Federal Death Penalty Act was enacted and added the phrase "learned in the law applicable to capital cases" in place of the phrase, "learned in the law," in the pre-1994 version of § 3005. *See United States v. Boone*, 245 F.3d 352, 359-60 (4th Cir. 2001). After observing the change in the 1994 amendment, this Court noted, "We decline to decide whether this wording creates a new requirement under the Act." *Id.* at 360.

For a number of reasons, this Court likewise need not address here the scope of any right to counsel "learned in the law applicable to capital cases." First,

49

§ 3005 should not apply to a defendant who has retained his own two lawyers. As then-Judge Burger has explained, § 3005 confers no rights when a defendant retains his own counsel. *Harried v. United States*, 389 F.2d 281, 284 (D.C. Cir. 1967) ("Appellant was represented from the preliminary hearing on by a retained attorney. Since the rights under § 3005 relate to appointed counsel, they are inapplicable to the present case.").

The reasoning of *Harried* is especially persuasive given the constitutional right to choice of retained counsel. *See United States v. Gonzalez-Lopez*, 126 S. Ct. 2557 (2006). The Supreme Court has held that the Sixth Amendment's right to choice of retain counsel "commands, not that a trial be fair, but that a particular guarantee of fairness be provided—to wit, that the accused be defended by the counsel he believes to be best." *Id.* at 2562.

In holding that a violation of a defendant's right to choice of retain counsel is structural error, mandating reversal without any harmlessness analysis, the Supreme Court explained in *Gonzalez-Lopez* that a defendant has the right to pick a lawyer who suits the defendant's own preferences. "To determine the effect of wrongful denial of choice of counsel, however, we would not be looking for mistakes committed by the actual counsel, but for differences in the defense that would have been made by the rejected counsel—in matters ranging from questions

50

asked on *voir dire* and cross-examination to such intangibles as argument style and relationship with the prosecutors." 126 S. Ct. at 2565.

As the district court found, Stitt had an existing attorney-client relationship with Malinski before this case. *Stitt*, 369 F. Supp.2d at 696. "It is not as if Petitioner was simply choosing a lawyer out of the Yellow Pages." *Id.* Stitt's affidavit also notes, "I had known Mr. Malinski for some time and had used him as an attorney. Before I was arrested, I would even have dinner with him on occasion." JA 1417. Stitt had a right to his own choice of retained counsel, and he selected someone he preferred. As the district court noted, Stitt had the opportunity to receive advice from both of his lawyers, Malinski and Swartz, and Stitt chose to reject Swartz's recommendation to plead guilty. 369 F. Supp.2d at 696 n.12 ("Regardless of which attorney's advice Petitioner eventually chose to follow, Petitioner had the advantage of Swartz's counsel and the opportunity to make use of it.").

Under Stitt's theory, however, § 3005 would apply to a defendant who has retained counsel and would mandate that the district court require a defendant's chosen counsel to meet a special, higher standard. The inquiry would not be the ordinary inquiry into effective assistance of counsel—an inquiry that all defendants are entitled to receive *after* their trials. Rather, Stitt postulates a *pretrial* inquiry where a lawyer who did not measure up to the district court's

51

estimation should be removed from the case. But such a prospective inquiry conflicts with the right to choice of retained counsel—particularly if the meaning of counsel "learned in the law applicable to capital cases" imposes some higher standard than simply a retrospective assessment of effective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984).

Presumably, some of the problem could be abated by waivers, but limiting § 3005 to its natural meaning avoids the tension. And where no waiver was obtained, courts would avoid conferring on defendants a potential claim to structural error whichever way the court ruled. If this Court were to conclude that a defendant has a pretrial right to an examination of a lawyer's qualifications in death-penalty law, and then extended its holding that denial of § 3005's right to two counsel mandates reversal without a harmlessness inquiry, *see Boone*, 245 F.3d at 361 n.8 (citing *United States v. Watson*, 496 F.2d 1125, 1130 (4th Cir. 1973)), defendants like Stitt could play two rights to automatic reversal against each other.

Retained counsel must of course satisfy the Sixth Amendment standard for effective assistance of counsel under *Strickland*, but that after-the-fact inquiry, unlike Stitt's theory of a pretrial § 3005 inquiry into qualifications, poses no special risk of infringing a defendant's right to choice of counsel and fully protects a defendant's rights. By limiting § 3005 to defendants who need appointed

52

counsel, courts avoid any conflict with the right to choice of counsel because defendants who need appointed counsel have no Sixth Amendment right to choice of counsel. *Gonzales-Lopez*, 126 S. Ct. at 2565.

In arguing that § 3005 confers rights on defendants who retain their own counsel, Stitt relies on *United States v. Massino*, 302 F. Supp.2d 1 (E.D.N.Y. 2003). But *Massino* did not discuss *Harried* and did not confront the problem of reviewing retained counsel's qualifications. Instead, *Massino* focused on adding counsel for defendants who had retained a single lawyer. 302 F. Supp.2d at 2. A court's discretionary decision to add appointed counsel that a defendant requests is a different matter than enforcing a screen on retained counsel.

But ultimately, this Court need not decide whether § 3005 applies to a defendant who has retained his own two lawyers. Nor does the court need to decide what meaning is carried by the phrase "learned in the law applicable to capital cases." Even if § 3005 were thought to apply, and were thought to trigger some type of review of retained counsel's qualifications, Stitt still would not be entitled to relief. As the district court observed, the plain language of § 3005 requires that a defendant make a request expressly invoking the rights under § 3005: the court "shall promptly, *upon the defendant's request*, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases." To give effect to this plain language, this Court has previously held that a

53

defendant must make an express request to receive the rights under § 3005.

*Boone*, 245 F.3d at 359 n. 7 (citing *United States v. Williams*, 544 F.2d 1215, 1218 (4th Cir. 1976)). The district court did not commit clear error in finding that Stitt never made a request triggering a right under § 3005 and thus was not entitled to any relief under that statute, even assuming the statute could apply to retained counsel. Moreover, as the district court concluded, under Fourth Circuit law, the court had no obligation to tell a defendant who already has his own chosen counsel that he has a right to appointed counsel under § 3005. *Williams*, 544 F.2d at 1218-19 & n.4.

Stitt argues that he had not duty to make a request for appointment of learned counsel because the district court asked Malinski about his death-penalty experience. But given a defendant's right to choice of retained counsel, a district court has no reason to urge a defendant to replace his chosen retained counsel, absent a specific request by the defendant. If this Court were to hold that § 3005 applies to defendants who retain counsel, the potential conflict posed by a district court questioning a defendant's choice of counsel ought to be minimized by requiring a specific request from the defendant. Moreover, as discussed below, neither the district court nor Malinski lied to Stitt. The district court found that Malinski's answers to the Court were not false, and the district court had no

54

general duty to ensure that a defendant has fully researched counsel that the defendant himself has chosen.

Given that § 3005 does not apply to retained counsel, and even if it did, Stitt failed to trigger any rights under that statute, Stitt's conflict argument based on the statute doesn't get off the ground. Malinski could not have had any conflict of interest because § 3005 did not threaten to displace him from the case. Stitt's theory has to be that if he possessed rights under § 3005, and if he invoked them, then the district court would have been required to make an inquiry that either would have convinced Stitt to replace Malinski or would have persuaded the court to remove Malinski over Stitt's objection (raising questions about Stitt's constitutional right to choice of counsel). Further, Stitt's theory presupposes that Malinski would have been aware of the possible threat to his position in the case, that he lied as a result, and that the lie then created the type of conflict plus prejudice that triggers the more stringent ineffective assistance claim under *Cuyler v. Sullivan*, 446 U.S. 335 (1980).

In judging conflicts and ineffective assistance, this Court does not pile possibility upon possibility in this fashion. *See, e.g., United States v. Burns*, 990 F.2d 1426, 1438 (4th Cir. 1993) (defendant's state-bar grievance against his lawyer did not create actual conflict because the lawyer could not "have gleaned

any advantage for himself in disciplinary proceedings before the state bar by failing to employ his best exertions . . . at trial").

The district court also knocked out another central underpinning of Stitt's argument, for the court found that Malinski did not lie about his qualifications. The district court found that "Malinski believed he had the necessary experience to represent [Stitt] in this case." *Id.* Stitt fails to show that this finding was clearly erroneous.

In arguing that the district court clearly erred, Stitt relies on the following question and answer that occurred before the trial: The district court asked Malinski, "it's my understanding that some question was raised regarding the certification of you as counsel to handle death penalty cases, and just for the record the court understands you have been handling capital cases for some twenty years; is that correct?" JA 150. Malinski replied, "In my 25 years I have handled several of them." *Id.* As Stitt notes, when Malinski said that he had "handled several" capital cases, he treated the question as inquiring whether his past experience included several cases where a defendant was charged with a capital offense. JA 1634. Malinski also noted that he believed his experience with drug cases to be important. *Id.* After Malinski testified at the § 2255 hearing, the district court found that Malinski "admitted that his experience with capital cases had never included a trial, but that he still believed he had the necessary

56

experience to represent Petitioner in this case." 369 F. Supp.2d at 696 n.12. The district court's conclusion was not clearly erroneous.

But even if it were true that § 3005 applies to defendants who retain their own counsel, that Stitt did not need to request any rights to counsel appointed under § 3005, and that Malinski did lie about his qualification, Stitt still would not be entitled to relief. Such a lie about a lawyer's qualifications, even when done to preserve a financial interest in the case, should not trigger the *Sullivan* standard. The government disagrees with this Court's extension of *Sullivan* after *Mickens v. Taylor*, 535 U.S. 162 (2001). But even if this Court concluded that Stitt had demonstrated the requisite "severe conflict" needed to trigger the *Sullivan* standard, *see Rubin v. Gee*, 292 F.3d 396, 402 n.2 (4th Cir. 2002), Stitt would still fail to show prejudice.

Stitt must claim prejudice where he has openly acknowledged that evidence of his guilt is overwhelming, where the record reflects that at the time of trial he preferred the advice of Malinski over other lawyers' advice, where there is no contention that Malinski's performance was ineffective at the guilt phase, and where Stitt is already going to receive a new death-sentencing hearing. And as the district court noted, Stitt was represented by two lawyers, and one did not have any conflict stemming from an alleged misrepresentation about his capital experience.

57

Even under *Sullivan*, once a defendant shows that defense counsel had the requisite conflict of interest, the defendant must still show that "the conflict has *significantly affected* counsel's performance." *Mickens*, 535 U.S. at 173 (emphasis added). In this Court's en banc opinion decided below in *Mickens*, this Court applied a three-part test. A defendant must show (1) a plausible alternative strategy that (2) was objectively reasonable and (3) was not pursued because of the conflict. *Mickens v. Taylor*, 240 F.3d 348, 361 (4th Cir. 2001) (en banc), *aff'd*, 535 U.S. 162 (2002). Defendant fails to meet this test. To claim prejudice solely because defense counsel did not step aside is to define prejudice out of the inquiry. By definition defense counsel did not step aside, so the prejudice inquiry would eliminated. Once the prejudice is not defined away, Stitt cannot point to any objectively reasonable, plausible alternative strategy that was not pursue at the guilt phase because of Malinski's statements about his capital experience.

IV.    **The district court did not clearly err in finding that Stitt's lawyers were paid with a flat fee and correctly held that no Sixth Amendment violation occurred from the decision not to hire guilt-phase investigators in North Carolina and Florida.**

A.    **Standard of Review**

In Stitt's previous appeal, this Court granted a certificate of appealability on this issue and ruled against Stitt on the merits. *Stitt*, 441 F.3d at 305-06. Of course, the ruling on the merits is not law of the case since this Court "recall[ed]

our earlier opinion, vacate[d] our judgment, and dismiss[ed] the appeal for lack of jurisdiction." *Stitt*, 459 F.3d at 484. Whether the ruling granting a COA remains binding could be a closer question. On the one hand, unlike a ruling denying a COA and finding no jurisdiction, the granting of a COA may be thought tied to a court's determination of the merits and hence vacated with the ruling on the merits. Once no appeal is pending, an appellate court's grant of a COA may be a nullity. But on the other hand, the standards for granting a COA of course are not equivalent to a ruling on the merits, *Swisher v. True*, 325 F.3d 225, 229-30 (4th Cir. 2003) (citing *Miller-El*, 537 U.S. at 335-336), and perhaps in some sense the original COA survives.

In any event, even if the original COA were thought to survive (and Stitt does not claim that it does survive), the law-of-the-case doctrine need not require review here, for the doctrine deals with efficient judicial administration. *Lettieri*, 478 F.3d at 652. While this Court is not bound by its earlier ruling on the merits, the Court need not ignore the closer scrutiny and reasoning that it previously applied in rejecting Stitt's claim on the merits. Stitt offers no new evidence, and if this Court continues to agree with its earlier analysis, which is reviewed below, no purpose would be served by granting a COA and relitigating the issue. *Cf. Phelps*, 366 F.3d at 727-28 (merits panel had power to vacate COA granted by motions panel).

59

**B.    Analysis**

In analyzing the financial conflict of interest that Malinski had, the district court distinguished between two theories.  First, the district court rejected the theory that all expenses, including expert fees, would have to be paid by Malinski from the fee that he received for his representation.  The court found that Malinski and Swartz "were paid flat fees for their services, with costs and expenses to be paid as they arose. . . . Petitioner's family agreed to raise the money for any additional costs and expenses."  *Stitt*, 369 F. Supp.2d at 691.  Thus, no financial conflict existed on the theory that Malinski would have to hand over fees that he had received to an expert.  As the district court explained, "there is no indication that the money Malinski received for his representation was directly correlated to money that would be paid for experts or other fees and costs."  *Id.* at 692.

The second theory of a financial conflict—the one the district court relied on to grant Stitt relief—required a determination that (a) Stitt's family could not afford a needed expert and (b) Malinski was concerned that going to the court to supplement the family's funds would produce unwanted inquiry into the original source of funds for Malinski's fee.  Only because (a) was true did the court find (b) applied.  The district court specifically found that the "money for Dr. Cunningham was supposed to have been raised by Petitioner's family, but the

family could only provide enough money to pay for Dr. Pasquale." *Stitt*, 369 F. Supp.2d. at 692.

Stitt has challenged the district court's factual finding that Malinski was paid a flat fee, with Stitt's family and friends paying for the costs of experts, but nothing establishes that the district court's factual findings were clearly erroneous. When a district court sits as finder of fact, this Court gives great deference to the district court's credibility determinations. *See, e.g., United States v. Murray*, 65 F.3d 1161, 1169 (4th Cir. 1995); *United States v. Locklear*, 829 F.2d 1314, 1317 (4th Cir. 1987). Courts have also often said that a finder of fact may decide to credit some parts of a witness's testimony, while rejecting other parts. *See, e..g, United States v. Arache*, 946 F.2d 129, 138 (1st Cir. 1991); *United States v. Cueto*, 628 F.2d 1273, 1275 (10th Cir. 1980); *United States v. Parr*, 516 F.2d 458, 464 (5th Cir. 1975).

In challenging the district court's factual findings, Stitt invokes the affidavit of Kenneth "Boobie" Williams, but the district court was not required to accept those statements, particularly after hearing the live testimony of Malinski, who denied Williams's claim. JA 1647. Nor was the district court required to believe Stitt's own affidavit about the fee arrangements.

Given the district court's determination that a financial conflict arose only if Stitt's family and friends were unable to pay for an investigator or expert, Stitt

61

fails to establish facts necessary to demonstrate that Malinski's decision (if it was his decision) not to hire an investigator for events in North Carolina gave rise to an actual financial conflict. If Stitt were able to find the funds to cover a particular cost, Malinski would have had no need to go to the court for funds, and hence no judicial inquiry, triggering the conflict, would arise. Not every last expenditure triggered a financial conflict.

In the extensive habeas proceedings below, Stitt never developed how much a guilt-phase investigator in North Carolina would have cost, what facts would have been worth investigating, or whether Stitt could have covered those costs. This Court does not review claims that depend on evidence not in the record. *United States v. Russell*, 971 F.2d 1098, 1112 (4th Cir. 1992). The same considerations apply to Stitt's theory that Malinski had not received his full fee and therefore had a financial interest in every expenditure made by Stitt's family. Stitt failed to build the record below about the family's financial resources, or Malinski's expectations about any unpaid portion of the fee, to show that the district court's determinations were clearly erroneous.

Given Stitt's failure to develop the necessary facts, it is impossible for this Court to determine whether there was an actual financial conflict of interest. As this Court noted, possible or potential conflicts are not enough to justify relief. *Burger v. Kemp*, 483 U.S. 776, 783 (1987) (possible conflict from attorney's

62

participation in co-defendant's trial "did not so infect [petitioner's] representation as to constitute an active representation of competing interests."); *Burns*, 990 F.2d at 1438 (defendant's state-bar grievance against his lawyer did not create actual conflict because the lawyer could not "have gleaned any advantage for himself in disciplinary proceedings before the state bar by failing to employ his best exertions . . . at trial").

But even if Stitt could show that the district court's credibility determinations and factual findings about the fee arrangement were clearly erroneous and that a financial conflict actually existed in the failure to hire investigators in North Carolina and Florida, Stitt still would not be entitled to relief.

First, the government does not concede that such a financial conflict is subject to the *Sullivan* standard post-*Mickens*. The government believes that this Court has construed too broadly the scope of the *Sullivan* standard post-*Mickens* by applying *Sullivan* whenever a "severe conflict" exists. *Rubin*, 292 F.3d at 402 n.2. Applying a presumption of prejudice would be particularly inappropriate here where the evidence of guilt is as overwhelming as it was and the effect on the outcome of the putative conflict is as remote as it is here. "Having derived the right to effective representation from the purpose of ensuring a fair trial, we have, logically enough, also derived the limits of that right from that same purpose."

63

*Gonzalez-Lopez*, 126 S. Ct. at 2563 (citing *Mickens*, 535 U.S. at 166). Courts do not mandate reversal and blindly apply a presumption simply to "enforce the Canons of Legal Ethics." *Mickens*, 535 U.S. at 176.

But this Court need not wrestle in this case with the question of which conflicts are covered by *Sullivan*. Even accepting that the *Sullivan* standard applies, a type of prejudice must still be shown, and Stitt cannot satisfy that prejudice standard—that "the conflict has *significantly* affected counsel's performance." *Mickens*, 535 U.S. at 173 (emphasis added). As noted above, this Court has identified a three-part test for determining when a conflict significantly affected counsel's performance. This Court has required (1) a plausible alternative strategy that (2) was objectively reasonable and (3) was not pursued because of the conflict. *Mickens*, 240 F.3d at 361. Stitt fails to satisfy all three prongs and hence fails to show a significant effect on counsel's performance.

First, nothing suggests the investigation of events in North Carolina or Florida was a plausible alternative strategy. Not only was the evidence of guilt overwhelming, but also the evidence of criminal conduct in Virginia easily and overwhelmingly exposed Stitt to the most serious penalties, including the death sentence. All three murders charged in the CCE murder counts, the firearms counts, and the drug counts occurred in Virginia. *See* Counts 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 18, 19, 20, 21, and 23; respectively, JA 116, 118, 119, 121, 122, 124,

64

125, 127, 129, 130, 131, 135, 136, 137, 140. To be sure, the drug-trafficking conspiracy count alleged that approximately 50 of the charged 215 over acts by Stitt and his coconspirators occurred in North Carolina, but the government is not required to prove an overt act in a prosecution under 21 U.S.C. § 846. *See Shabani v. United States*, 513 U.S. 10 (1994).

Trial resources, including both money and time are necessarily limited under any circumstances, and focusing on the murders that occurred in Virginia and the evidence for a penalty phase were obviously much more significant priorities. Stitt complains that his attorneys did not do enough to prepare for an inevitable penalty phase, while acknowledging that the evidence against him was overwhelming. Had his attorneys devoted significant resources to investigating events in North Carolina or Florida, that might well have opened his attorneys to a new, more plausible claim of attorney error—that they focused on details that didn't matter.

Stitt likewise fails to show any relationship between the decision not to hire investigators in North Carolina and Florida and the putative conflict. Because the evidence does not show whether Stitt's family and friends could have afforded an investigation, it is impossible to know whether the conflict had any material role in a decision not to investigate. Everyone could have easily decided that such an investigation simply wasn't worth the candle. Investigations obviously can begin

65

with preliminaries and rely on cheaper sources at the beginning. The fact that apparently no inexpensive preliminary investigations in North Carolina and Florida were pursued—when Stitt would have had personal knowledge about the value of such an investigation and could have helped assess its worth—suggests that such investigations were not an appropriate focus of the defense. There is no evidence that Stitt's family and friends couldn't support *any* investigation outside Virginia, but unlike for the mitigation expert, where a cheaper expert was hired, no investigator in North Carolina or Florida was hired. Moreover, there is no reason to suppose that investigators located in North Carolina or Florida were necessary to inquire into events in those states. If preliminary inquiries had proven useful, more could have been attempted. But again, all of the critical counts dealt with events in Virginia. Stitt offers far too little to make this claim plausible.

## CONCLUSION

For the reasons stated above, this Court should deny a certificate of appealability for both issues Stitt raises, and this Court should reverse the district court's ruling prohibiting the government from empaneling a new death-sentencing jury, vacate Stitt's sentence, and remand for a new penalty phase applying either the sentencing procedures in 21 U.S.C. § 848 or the procedures in the Federal Death Penalty Act.

66

Respectfully submitted,
CHUCK ROSENBERG
UNITED STATES ATTORNEY

By: _____
Richard D. Cooke
Assistant United States Attorney
600 East Main Street, Suite 1800
Richmond, Virginia 23219
(804) 819-5400

## STATEMENT REGARDING ORAL ARGUMENT

The United States respectfully suggests that oral argument may be helpful to the Court in this case. The application of the Savings Statute, 1 U.S.C. § 109, to the repealed provisions in 21 U.S.C. § 848 is a novel question with important ramifications. The scope of a district court's equitable powers under 28 U.S.C. § 2255 also raises important questions.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I hereby certify that:

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(B)(i) because this brief does not exceed 16,500 words (specifically 16,081 words), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect X3 in 14-point Times New Roman typeface.


Richard D. Cooke
Assistant United States Attorney

## CERTIFICATE OF SERVICE

This is to certify that two copies of the foregoing Brief of the United States were mailed to the attorneys listed below on this 14th day of November 2007:

Gerald T. Zerkin
Amy L. Austin
Assistant Federal Public Defenders
830 East Main Street, Suite 1100
Richmond, Virginia 23219

Jeffrey L. Stredler
Williams Mullen
Dominion Tower, Suite 1700
999 Waterside Drive
Norfolk Virginia 23510-3301


Richard D. Cooke
Assistant United States Attorney